**In the Matter of I. J. KNIGHT REALTY CORP., Bankrupt.**

**No. 27540.**

United States District Court,
E. D. Pennsylvania.

April 11, 1977.

---

See also, D.C., 366 F.Supp. 450.

Patrick J. DiQuinzio, Arthur E. Newbold, III, Philadelphia, Pa., for trustee.

J. Brian Ferrel, Dept. of Justice, Washington, D. C., for United States of America.

Thomas Raeburn White, Jr., Michael H. Malin, White & Williams, Philadelphia, Pa., for intervenors, Reading Co., and other fire loss claimants.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

Before the Court for resolution are cross motions for summary judgment filed by the Trustee in Bankruptcy of I. J. Knight Realty Corp. ("Trustee") and the United States regarding the government's claim for certain federal income taxes. Disposition by summary judgment is appropriate since the parties have submitted a joint stipulation of facts.

To provide the context for the legal questions raised, a brief summary of the facts and prior proceedings is appropriate. I. J. Knight Realty Corp. ("I. J. Knight") is a Pennsylvania corporation which formerly owned as its principal asset the Fretz Building located at 10th and Diamond Streets in Philadelphia. I. J. Knight's business consisted of leasing space in this building and maintaining it for the benefit of its tenants.

On November 16, 1962, the corporation filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701–799. Francis Shunk Brown, Esquire, was appointed receiver and authorized to continue operation of the business. Approximately six weeks later, on January 1, 1963, the Fretz Building was totally destroyed by fire in one of the largest conflagrations in Philadelphia history. The fire destroyed all of I. J. Knight's corporate records and damaged adjoining properties severely. Because of the destruction of the corporation's principal asset, no business remained for the receiver to operate. There were, however, numerous claims filed with the receiver for damage resulting from the fire. The dollar amount of these claims was considerably in excess of I. J. Knight's total assets. It was alleged (and ultimately held by the Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968)) that these claims constituted administrative expenses of the Chapter XI proceeding and therefore took priority over the claims of general creditors.

Left with no business and crippling damage claims, I. J. Knight filed for bankruptcy, and on May 14, 1963, was adjudicated a bankrupt. Francis Shunk Brown, Esquire, the former receiver, was elected trustee in bankruptcy. Besides its land and a small amount of cash, at this point, I. J. Knight's value lay in insurance claims against Lloyds, London, Southwest Casualty Co., and Annapolis Fire & Marine Insurance Co., in a gross amount of $1,440,000. The trustee settled the claim against Lloyds for $800,000., received in fiscal 1964, and later, in fiscal 1966, settled the claims against the other two companies for $56,250. A portion of these funds was placed in interest bearing accounts while awaiting distribution in liquidation.

On February 15, 1967, counsel for the Trustee filed federal income tax returns for fiscal years 1963–1966.[1] These returns showed miscellaneous income including interest on the deposited money, and for years in which insurance settlements had been received, these amounts in full were listed as "Gain from disposition of Depreciable Property under Section 1245." It was noted, however, that actual gain on the involuntary conversion caused by the fire could not then be computed. Because I. J. Knight's corporate records had been lost in the fire, its adjusted basis in the Fretz Building was unknown. Based on the figures then available to the Trustee, each return showed no taxable income after deductions and net operating loss carry-overs and, hence, no federal income tax due. Returns for subsequent years were filed on or before their due dates and followed basically the same format.

In 1971, the I.R.S. conducted an audit of the Trustee's returns for fiscal years 1963 through 1970. As a result of this audit, certain deductions and net operating loss carry-overs were disallowed. In addition, the auditing agent determined the adjusted basis of the Fretz Building to be $237,-036.78, thus making the gain on its involuntary conversion $619,213.22. This gain in its entirety was allocated to fiscal year 1964 by the auditor. The above changes resulted in deficiencies which were assessed against the Trustee. The I.R.S. also claimed that I. J. Knight owed Personal Holding Company Tax under Section 541 of the Internal Revenue Code.

In September and October 1972, the Trustee and the Government each filed motions for summary judgment based on the facts as stipulated. It was the Trustee's contention at that time that a "non-operating" trustee for a bankrupt corporation is not liable for the payment of federal taxes on income generated during the liquidation and distribution of the bankrupt estate. On August 14, 1973, this Court so held in a Memorandum and Order granting the Trustee's motion for summary judgment and denying the government's motion for summary judgment. *In Re I. J. Knight Realty Corp.*, 366 F.Supp. 450 (E.D.Pa.1973). Since that ground alone was dispositive of both motions, the Court did not consider the other contentions of the parties.

On July 31, 1974, the Third Circuit Court of Appeals reversed the judgment of this Court and remanded the case for further proceedings. *In Re I. J. Knight Realty Corp.*, 501 F.2d 62 (3d Cir. 1974). Between that time and the present, the parties have tried diligently to settle the claims to no avail. The issues have, however, been considerably simplified and refined in two respects. First, taxes for post-1966 fiscal years have been eliminated from consideration. The Trustee has conceded that the federal income tax claims for these years are administrative expenses of the bankruptcy proceeding and that interest accrues on these claims as provided by law. The parties have agreed upon the amounts due for these years and by order of this Court dated August 21, 1975, the Trustee was authorized to pay these amounts. Second, the United States has abandoned its claim for personal holding company taxes.

Accordingly, there are four questions left for resolution by the Court with respect to fiscal years 1964, 1965 and 1966. These are:

1. I. J. Knight's fiscal year ran from December 31st to November 30th.

1. Whether the tax claims of the United States for these years are barred by the applicable statute of limitations.

2. Whether the Trustee was entitled to a deduction under Section 461(f) of the Internal Revenue Code and, if so, the amount of that deduction.[2]

3. Whether the claim of the United States for fiscal 1964 is an expense of the administration of the Chapter XI proceeding which gives it a priority *only as high as* the fire damage claims, or an expense of the succeeding bankruptcy which would give the claim priority *over* the fire loss claims.

4. Whether the Trustee is subject to additions to tax imposed by Section 6651(a) of the Internal Revenue Code for fiscal years 1964 and 1965.

In connection with issue 3, the Court has granted the motion of the Reading Company (the principal fire loss claimant) and other fire loss claimants represented by the same counsel to intervene in this proceeding.

## I. The Statute of Limitations.

Section 6501(a) of the Internal Revenue Code provides that assessments of tax allegedly due must be made by the Internal Revenue Service within three years after the return was filed. Failure to meet this deadline bars collection of the tax. The Trustee filed what are alleged to be I. J. Knight's tax returns for fiscal 1963, 1964, 1965 and 1966 on February 15, 1967; the I.R.S. assessed the alleged income tax deficiencies here in issue by letter dated November 12, 1971 and proofs of claim filed with the Trustee on March 2 and 24, 1972, all more than three years after the returns were filed. The specific issue for the Court thus becomes whether the papers filed as returns in 1967 were sufficiently complete to constitute "returns" within the meaning of the Internal Revenue Code. If they were, then the assessments are barred.

Each return was filed on a corporate income tax return form 1120 and specified each item of income and each deduction for the fiscal year in question. On the returns for fiscal 1964 and 1966, the Trustee reported the receipt of the proceeds of the settlements with the fire insurance companies, however, no gain or loss as a result of the involuntary conversion of the Fretz Building was computed. Such computation was impossible since the corporate records showing adjusted basis of the building were destroyed in the fire. As previously stated, each return showed no taxable income after net operating loss carry-overs.

Each return also carried the following notation to the I.R.S. explaining why certain figures could not be shown on the return:

The Corporation is in a pending bankruptcy proceeding (Docket 27540) in the United States District Court for the Eastern District of Pennsylvania. Proofs of Claims have been filed on behalf of the Internal Revenue Service and numerous items making up prior returns are in dispute. Since correct figures have not been agreed upon and await resolution of these claims it is impossible to furnish the balance sheet, net operating loss deduction, etc. Upon resolution of the claims, more complete returns will be filed.

As yet no further returns have been filed.

The covering letter from Trustee's counsel, dated February 15, 1967 and filed with these returns, also pointed out that I. J. Knight's returns for fiscal years 1958–1962 were under audit before the Internal Revenue Service Appellate Division in Philadelphia. The covering letter requested that the enclosed returns be forwarded to the Appellate Division for disposition along with the prior years' returns.

---

2. Pursuant to a February 3, 1975 stipulation, counsel for the Trustee and counsel for the Government agreed that if the Trustee is not entitled to any deduction under Section 461(f) and if the Court finds that the statute of limitations did not bar the assessment for any of these years, then the Federal income tax claim of the United States for these years is as follows:

(a) For Fiscal Year Ended 11/30/64 $154,803.30
(b) For Fiscal Year Ended 11/30/65 4,709.32
(c) For Fiscal Year Ended 11/30/66 5,829.71

The Trustee's return for fiscal 1963 showed rental income of $7,628.85, miscellaneous income of $370.89 and various expenses aggregating $20,396.07, producing a loss from operations of $12,396.83. In addition, the return claimed a deduction under Section 461(f) of the Internal Revenue Code (the subject of issue III, infra) of $3,000,-000.00 for "Damage Claims Asserted," producing a total net operating loss of $3,012,-396.83.

In his return for fiscal 1964 the Trustee reported the interest income of $6,815.79 earned on the deposits, as well as various deductions aggregating $78,575.64. The receipt of $800,000.00 of insurance settlement proceeds was noted as follows in Part I of Schedule D, entitled "Gain from Disposition of Depreciable Property under Section 1245:"

"Fire insurance proceeds during year amounted to $800,000.00. Gain or loss on fire cannot be computed at this time. This return is under examination by the I.R.S."

The fiscal 1966 return carried the same notation, except that the figure was changed to show the receipt of $56,250. in insurance settlement proceeds in that year.

In the returns for fiscal 1965 and 1966, the Trustee again reported the interest income earned in each year from the deposits and took various deductions. In each return the difference between the gross income and deductions as reported was offset by a net operating loss carry-over.

At the audit in 1971, the Section 461(f) deduction in fiscal year 1963 was disallowed by I.R.S., as were various unpaid expense deductions and most net operating loss deductions. The I.R.S. verified the receipt of the $856,250. of insurance proceeds; determined that the Trustee's adjusted costs basis for the Fretz Building was $273,036.78; and determined that, as a result of the involuntary conversion of the Fretz Building, a taxable gain of $619,213.22 ($856,250. less $237,036.78) was realized on the collection of the fire insurance proceeds. The auditing agent also determined that all of this gain was taxable to the Trustee in fiscal 1964. These changes, which produced the alleged deficiencies asserted here, will be discussed in more detail later.

The above facts convince the Court that the returns filed were clearly as complete as could reasonably be expected in view of the ongoing audit of prior years' returns and the loss of corporate records caused by the fire. No allegation is made that there was any misrepresentation or attempt to evade taxes. The Trustee endeavored in the utmost good faith to meet his obligations to file tax returns. However, in order to start the statute of limitations running, returns must be sufficiently complete to enable the I.R.S. to determine the correct tax liability. *Myles Salt Co., Ltd. v. Commissioner,* 49 F.2d 232 (5th Cir. (1931); *Valentine-Clark Co. v. Commissioner,* 52 F.2d 346 (8th Cir. 1931). Our tax system is based on self-assessment and the burden is on the taxpayer to supply adequate information. *Florsheim Bros. Dry Goods Co. v. United States,* 280 U.S. 453, 50 S.Ct. 215, 74 L.Ed. 542 (1930); *Alkire Inv. Co., Inc. v. Nicholas,* 114 F.2d 607 (10th Cir. 1940); *National Contracting Co. v. Commissioner,* 105 F.2d 488 (8th Cir. 1939). It would be unfair to afford the benefit of the statute of limitations to a taxpayer whose return was so incomplete and sketchy that his proper tax liability could not be determined.

On the other hand, not every incomplete return will fail to trigger the running of the statute of limitations. The Supreme Court has held that,

. . . Perfect accuracy or completeness is not necessary to rescue a return from nullity, if it purports to be a return, is sworn to as such . . . and evinces an honest and genuine endeavor to satisfy the law. This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary. *Zellerbach Paper Co. v. Helvering,* 293 U.S. 172, 180, 55 S.Ct. 127, 131, 79 L.Ed. 264 (1934).

The major alleged deficiency in I. J. Knight's returns is the failure to compute

the gain on the involuntary conversion of the Fretz Building. The total of the insurance proceeds was known, but the adjusted basis to be subtracted from this total to determine gain was not. Although it was impossible to compute gain, the occurrence of the involuntary conversion and the full amount of the insurance proceeds were disclosed on the return. Standing alone, this degree of completeness would probably be sufficient to start the statute of limitations. In *C. T. McDaniel*, 44 B.T.A. 570 (1941), the Board of Tax Appeals held that a corporate tax return which failed to compute gain on a sale of assets, but fully disclosed the fact of the sale was sufficiently complete to trigger the statute of limitations.

The fundamental difference which points toward a contrary conclusion here is that the taxpayer attached a note to the return stating that "upon resolution of the claims, more complete returns will be filed." This notation would reasonably indicate to the I.R.S. that the returns were not the Trustee's final word and that more would follow. It would thus be reasonable to wait until the final returns were in before examining them critically to determine their correctness. The case law seems to allow the I.R.S. this privilege.

■ It is already established that returns labeled "Tentative" do not start the statutory period running. In *Florsheim Bros. Dry Goods Co. v. United States, supra*, the Court held that a tentative return form specifically provided for by I.R.S. procedure did not start the statute of limitations. The problem there faced was caused when the Revenue Act of 1918 was not approved until February 24, 1919, with returns due March 15, 1919. Because of the short interval available to prepare returns, the I.R.S. promulgated a "tentative" return form which was to be filed by the due date with the final return to follow later. Even though this form may technically have been a re-

turn, the Court found it insufficient for statute of limitations purposes where a final return was also anticipated. See also, *Lucas v. Pilliod Lumber Co.*, 281 U.S. 245, 50 S.Ct. 297, 74 L.Ed. 829 (1930). In *J. L. Foutz*, 24 T.C. 1109 (1955), the taxpayers filed a return on the ordinary form which they labeled "Tentative" by typing this word at the top. They later attempted to claim that this return started the statute of limitations. In rejecting this claim on the grounds of estoppel, the Tax Court stated,

> By making their return "Tentative" petitioners clearly indicated that they did not intend it as a final return, and that something more was to follow. 24 T.C. at 1112.

■ Although the word "Tentative" was not used, much the same idea was conveyed by the Trustee in this case when he informed the I.R.S. that ". . . more complete returns will be filed." The promise of something more to follow reasonably permitted the I.R.S. to treat the returns as non-final. It would be unfair to allow the Trustee to consider them final now for statute of limitations purposes. The Court therefore concludes that the statute of limitations does not bar the assessments made by the Commissioner.[3]

## II. The Section 461(f) Deduction.

After the disastrous fire of January 1, 1963, Francis Shunk Brown, III, Esquire, the receiver and subsequently Trustee of I. J. Knight, received more than $3,000,000.00 in fire damage claims from third parties which contended that the fire was caused by the negligence of the receiver or his employees. Although Brown, as Trustee, diligently contested liability for these claims, on I. J. Knight's tax return for fiscal 1963, he took a deduction of $3,000,000.00 in respect of them, relying on § 461(f). The Trustee now concedes that

---

**3.** Although the case of *C. T. McDaniel, supra*, which reached an opposite result has facts strikingly similar to those presented here, it is to be noted that in that case a tentative return was first filed followed three months later by a final return. Only the final return was held to start the statute of limitations. *Citing Florsheim Bros. Dry Goods Co. v. United States, supra*, the Board made it clear that a tentative return would not start the statutory period running. 44 B.T.A. at 570.

the maximum amount of any deductions would be $988,280.11, the total value of I. J. Knight's assets as of the date of bankruptcy. There is also agreement that at some point a deduction for fire loss liability was or will be proper. The disagreement centers around whether Section 461 allows the Trustee to take that deduction in fiscal 1963.

Section 461 of the Internal Revenue Code establishes rules for determining the year in which a deduction may be taken. Section 461(f) contains a special rule which allows a deduction for a contested liability to be taken in the year in which it is provided for by the taxpayer rather than the year in which the contest is finally settled. The section was added by Congress in 1964 to overrule by legislation the rule of *United States v. Consolidated Edison Co., Inc.*, 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961). In that case, the Supreme Court held that even though a contested tax had been paid, no deduction could be taken for it until the year in which the contest was ended.

To qualify a deduction under Section 461(f), four criteria must be met. The section provides:

If—

(1) the taxpayer contests an asserted liability,

(2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. * * *

The parties agree that the deduction taken by the Trustee meets criteria (1), (3) and (4). The only issue is whether the second criterion, that the taxpayer *transfer* money or other property to provide for the satisfaction of the asserted liability, has been met.

The Trustee contends that the transfer of all assets of I. J. Knight from the receiver under Chapter XI to the Court pursuant to the adjudication of bankruptcy on May 14, 1963, constitutes the *transfer* required by Section 461(f)(2). He reasons that since *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), establishes that all fire damage claims are first priority administrative claims and since these claims far exceed the value of the assets, the transfer to the Court constitutes provision for contingent liability on the fire damage claims. In support of his position, the Trustee relies on excerpts from the Treasury Regulation specifying how criterion (2) may be met. Regulation Section 1.461–2(c)(1) provides in part: [4]

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control . . . (iii) to a trustee pursuant to an order of . . . a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for

---

4. This section provides in full:

A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement (among the escrowee or trustee, the taxpayer, and the person who is asserting the liability) that the money or other property be delivered in accordance with the settlement of the contest, or (iii) to an escrowee or trustee pursuant to an order of the United States, any State or political subdivision thereof, or any agency or instrumentality of the foregoing, or a court that the money or other property be delivered in accordance with the settlement of the contest. A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. Purchasing a bond to guarantee payment of the asserted liability, an entry on the taxpayer's books of account, and a transfer to an account which is within the control of the taxpayer are not transfers to provide for the satisfaction of an asserted liability. In order for money or other property to be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest.

Specifically, the Trustee maintains that the bankruptcy adjudication constituted an order that the money and property of I. J. Knight be delivered in accordance with the settlement of the fire damage claims and/or that it constituted a transfer to a court with jurisdiction over the contest since the Bankruptcy Court has jurisdiction over contested administrative claims.

On the other hand, it is the government's position that there was no transfer qualifying under Section 461(f)(2). The regulations stress that a qualifying transfer must put the property beyond the taxpayer's control and must be specifically earmarked for the payment of the contested liability. The transfer to the Bankruptcy Court, the government contends, satisfies neither condition.

■ Although the arguments on each side of the question are well taken, the Court is persuaded that the government's position has greater weight. Initially, it must be noted that tax deductions are matters of legislative grace to be strictly construed. Only if there is clear provision for a deduction may it be allowed. *Commissioner v. National Alfalfa Dehydrating*, 417 U.S. 134, 148–49, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974); *New Colony Ice Co. v. Helvering*, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348 (1934). Such clear provision is lacking in the circumstances of this case. The transfer alleged to satisfy Section 461(f)(2) fails to constitute a transfer "to provide for the satisfaction of the asserted liability." The Court agrees with the government that Congress intended that a qualifying transfer must be specifically earmarked for payment of the particular liability. The Senate's report on the Tax Reform Act of 1964,[5] of which Section 461(f) is a part, stresses this aspect by using the term, "payment" in its description of the operation of the section.[6] Although a strict construction of this term is not indicated, it is clear that Congress intended a qualifying transfer to be *directly* linked to the contingent liability.

■ The Trustee's argument provides only an indirect, attenuated link. Although it may well have appeared at the time of filing the returns in question that the entire bankrupt's estate would be required to satisfy the fire damage claimants if they were successful, the transfer of assets to the Bankruptcy Court was for the purpose of disposition in accordance with bankruptcy law, not *specifically* for the payment of fire damage claims. In fact, even though no fire damage claims have yet been paid, already certain unrelated secured claims[7] and incidental expenses have been paid out of the estate. The type of transfer contemplated by Section 461(f)(2) is wholly incompatible with the consequences of a transfer of property pursuant to a bankruptcy decree. The former must limit the transferred property's use to payment of specific liabilities; the latter must leave the assets available to satisfy all claimants in accordance with bankruptcy law. The fortuitous circumstance that bankruptcy law could mandate the application of the entire estate in satisfaction of the contested liability does not alter this basic dichotomy. Accordingly, the Court is constrained to hold that the transfer of assets to the Bankruptcy Court cannot satisfy the requirements of Section 461(f)(2).

The Trustee contends alternatively that if I. J. Knight is not entitled to a deduction for the entire value of the estate pursuant to Section 461(f), then such a deduction should be allowed for $825,490.66, the

---

5. S.Rep.No.830, 88th Cong., 2d Sess., reprinted in [1964] U.S.Code Cong. & Ad.News, p. 1673.

6. Id. at 1773. The report provides:
 The amendment provides that if a taxpayer contests an asserted liability, such as a tax assessment, but makes a payment in satisfaction of this liability and the contest with respect to the liability exists after the payment, then the item involved is to be allowed as a deduction or credit in the year of the payment.

7. On March 3, 1964, the Trustee was authorized to pay $162,789.45 out of the insurance proceeds to Presbyterian Ministers Fund on account of its Mortgage on the Fretz Building.

amount of the net insurance recovery realized as of the date of bankruptcy plus the value of the other property transferred to the Bankruptcy Court. In the further alternative, the Trustee believes he should be entitled at the least to a deduction for the $565,000. deposited in interest bearing accounts in 1964 and 1965. Under the Court's analysis above, however, these contentions require no discussion. The first alternative presents no reasons why that particular property should be subject to deduction when the entire estate is not. As for the second alternative, the transfer of funds to interest bearing accounts was merely for preservation of the estate in accordance with the trustee's fiduciary duty, not specifically for the payment of fire damage claims. Thus, it can no more validate the deduction than the transfers to the Court pursuant to the bankruptcy decree.

Since the Court has decided that the I.R.S.'s assessment of tax is not barred by the statute of limitations and that the Trustee was not entitled to a deduction under Section 461(f) in any amount, in accordance with the stipulation of the parties, the claim of the United States is as follows:

(a) for fiscal 1964 $154,803.30
(b) for fiscal 1965 4,709.32
(c) for fiscal 1966 5,829.71

III. Priority of the 1964 Tax Claim.

As previously stated, the Fretz Building fire caused extensive damage to real and personal property in the surrounding area. The Reading Railroad sustained the greatest losses and has filed claims for over $500,000. damage. These claims, along with the others, allege that the damage was caused by the negligence of the receiver or his employees, and therefore the claims are entitled to first priority under Section 64 of the Bankruptcy Act, 11 U.S.C. § 104, as administrative expenses. Although the referee, this Court and the Court of Appeals all rejected the characterization, the Supreme Court in *Reading Co. v. Brown, supra*, reversed, holding that all damages

shown to have been caused by the receiver's negligence were first priority administration expenses. On June 15, 1976, this Court entered Summary Judgment of liability in favor of the fire damage claimants, holding that the fire damage *was* caused by the receiver's negligence. Thus, after an arduous upstream paddle, the fire damage claims, when proven, will constitute first priority claims of the receivership.

There remains, however, one further hurdle for the fire damage claimants. The I.R.S. characterizes its income tax claim for 1964 as an administrative expense of the bankruptcy (as opposed to the receivership). Section 64 of the Bankruptcy Act, 11 U.S.C. § 104, provides that where a bankruptcy follows a chapter proceeding, the administrative expenses of the bankruptcy period have priority over the unpaid administrative expenses of the chapter proceeding. Thus, the I.R.S. contends that its tax claim has priority over the fire damage claims.

In support of its characterization of the tax claim as an administrative expense of the Bankruptcy, the I.R.S. asserts that because the tax is one on income for the entire fiscal year and the obligation to pay it arises only at the end of the year, at which time I. J. Knight was in bankruptcy, the tax claim is an expense of the bankruptcy period.

It is the contention of the Trustee, and the Reading Co., which has been granted leave to intervene on this issue [8] that the 1964 tax claim is an administrative expense of the receivership, not the bankruptcy, and is entitled only to equal treatment with the fire damage claims. These parties reason that the 1964 tax claim represents tax on the gain resulting from the involuntary conversion of the Fretz Building which occurred during the receivership and as such is an expense of administration of the receivership.

Basic to this contention is the notion that the 1964 tax claim represents, exclusively, taxes on the gain from involuntary conversion of the Fretz Building. The parties

---

**8.** On December 9, 1976, this Court granted Reading Co.'s motion to intervene.

base this notion on the determination of the 1971 audit examiner that all of the gain was taxable to the Trustee in fiscal 1964, further reasoning that since other allowed deductions for that year more than offset the small amount of ordinary income, all the tax must be specifically attributable to the gain on the involuntary conversion.

From this base, they rely on *Otte v. United States*, 419 U.S. 43, 95 S.Ct. 247, 42 L.Ed.2d 212 (1974), for the proposition that the tax claim, like the fire damage claim, is an administrative expense of the receivership period. The *Otte* case arose out of the Chapter XI arrangement and subsequent bankruptcy of the Freedomland Amusement Park in New York City. In the three month period before bankruptcy, while in Chapter XI, certain wages were earned by employees which were not paid until after bankruptcy. The required federal withholding taxes on these wages were not paid at that time. In its claim for these taxes, the I.R.S. argued that since the withholding taxes did not become due until the wages were actually paid during the bankruptcy period, the claim for these taxes was an expense of administration of the Bankruptcy, entitled to first priority.

The Supreme Court rejected this argument and held that the withholding taxes should take the same priority as the wage claims out of which they arose. According to the Trustee, in principal, the *Otte* case and the present case are virtually identical. In the *Otte* case the liability for the withholding taxes arose during the bankruptcy period when the wages were paid, but represented taxes on wages earned prior to bankruptcy. In the case at hand, the income tax liability arose during the bankruptcy period when the fire insurance proceeds were received, but represented the tax on a gain from an involuntary conversion that took place prior to bankruptcy. In both cases the tax is based on an event which took place prior to bankruptcy.

However, the government regards *Otte* as inapplicable because of the fundamental difference between wage and income taxes. Wage taxes, argues the government, are discrete taxes, susceptible to connection with a specific event, the payment of wages. Income taxes, on the contrary, are based on an annual accounting which lumps together the year's events to determine the tax due. Thus, the income tax cannot be connected with specific events, but is based on the sum total of the year's experience. Since income tax for 1964 could not be calculated until the close of the fiscal year which occurred during the bankruptcy period, it became certain only at that point and is properly an administrative expense of the bankruptcy.

■ The government's position has considerable merit. It is true that the income tax as we know it is based on an annual, as opposed to a transactional theory of accounting. *United States v. Consolidated Edison Co.*, 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961); *Heiner v. Mellon*, 304 U.S. 271, 58 S.Ct. 926, 82 L.Ed. 1337 (1937); *Burnet v. Sanford and Brooks Co.*, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931). There is no tax *in se* on the involuntary conversion of the Fretz Building. Rather the tax is on income for fiscal 1964, of which the gain on that involuntary conversion is a component. It is also true that the obligation to pay that tax accrued at the end of fiscal 1964 when I. J. Knight was in bankruptcy. However, at a minimum, *Otte* stands for the proposition that the date of accrual of a tax is not alone determinative of its priority in bankruptcy. The Supreme Court stated,

We think that more than a general observation that the taxes arose during bankruptcy is required to dignify withholding taxes with the prime status of first priority. 419 U.S. at 56, 95 S.Ct. at 256.

The Court believes this statement is applicable to income taxes as well, at least as presented in this case.

The Supreme Court also agreed with the observation that:

Conceptually, the tax payments should be treated in the same way as the wage claims from which they derive and of which they are a part. 480 F.2d at 190,

quoted in 419 U.S. at 57, 95 S.Ct. [247] at 256.

Likewise, the Court believes that the income tax should be treated in the same way as claims stemming from the event from which it arose, if it is possible *in fact* to connect the income tax with discrete events.

 As already stated, in the general case it is not possible to ascribe a year's income tax to a single sale or exchange of property. The tax is on the year's income, not the particular event. However, in *this* year, for *this* corporation it can be said that *in fact* the entire income tax liability arises from the involuntary conversion of the Fretz Building.

On the original return for fiscal 1964, the Trustee reported interest income of $6,815.79, interest deductions of $8,467.77 and "other deductions" of $78,575.65. This produced a substantial loss for the year on which there was, of course, no tax. At audit in 1971, one of the changes the I.R.S. made was disallowance of $75,213.40 of the "other deductions." Even considering this disallowance, the remaining deductions which were not challenged were more than sufficient to offset the income earned. Other changes made at the audit further affect the picture. The $619,213.22 gain on the conversion was included in income for fiscal 1964. In addition, a net operating loss carry-back deduction of $74,888.10 was allowed. This produced a taxable income of $539,310.90 and a tax liability of $154,803.31. Thus, when the gain from the involuntary conversion is not considered, there is no tax, when it is included there is substantial tax. This demonstration permits the conclusion that the tax for fiscal 1964 is in fact all attributable to the Fretz Building fire. In further support of this conclusion, the Court notes that since the amount of the tax represents 25% of the gain, all the tax was determined by using the 25% tax rate on capital gains then in effect, and thus was all attributable to the capital gain.

Since it is valid to conclude that both the income tax for 1964 and the fire damage claims arose from the same event, we believe that conceptually they should be treated the same way and should receive the same priority in bankruptcy. *Otte v. United States, supra.* It is settled that the fire damage claims are administrative expenses of the receivership. *Reading Co. v. Brown, supra.* There is also no question that the involuntary conversion of the Fretz Building occurred during the receivership even though the insurance claims were not paid until after bankruptcy. *Central Tablet Mfg., Co. v. United States,* 417 U.S. 673, 94 S.Ct. 2516, 41 L.Ed.2d 398 (1974). Thus, the tax claim for 1964, arising exclusively from the involuntary conversion, should be treated as an administrative expense of the receivership, and the Court so holds.

IV. Liability for Penalties.

 As a further result of its 1971 audit, the I.R.S. advised the Trustee that it was assessing late filing penalties under Section 6651(a)(1) of the Internal Revenue Code for fiscal 1964 and 1965 in the amount of $38,700.83 and $3,735.58, respectively. The Trustee challenges the government's right to assess these penalties.

Since 6651(a)(1) provides that in case of failure to file returns on the due date, under the circumstances presented in this case, a 25% penalty shall be added to the tax due, "unless it is shown that such failure is due to reasonable cause and not due to wilful neglect." If the Trustee has shown reasonable cause and absence of wilful neglect, imposition of the penalty is improper.

It is clear in this case that the Trustee has made the requisite showing. Filing of the returns for 1964 and 1965 was delayed until 1967 on the advice of competent tax counsel. A long line of cases holds that advice of reputable counsel that a taxpayer is not liable for a certain tax or not required to file a return establishes that failure to file within the prescribed time is due to reasonable cause and not wilful neglect. *Mayflower Investment Co. v. C.I.R.,* 239 F.2d 624 (5th Cir. 1956); *C.I.R. v. American Association of Engineers,* 204 F.2d 19 (7th

Cir. 1953); *Haywood Lumber and Milling Co. v. C.I.R.*, 178 F.2d 769 (2d Cir. 1950); *Dayton Bronze Bearing Co. v. Gilligan*, 281 F. 709 (6th Cir. 1922); *Miller v. United States*, 211 F.Supp. 758 (D.Wyo.1962); *Portable Industries, Inc.*, 24 T.C. 571 (1955); *Lindback Foundation v. Commissioner*, 4 T.C. 652, *aff'd*, 150 F.2d 986 (3d Cir. 1945).

Moreover, in view of the state of the law during the relevant period, counsel's advice was reasonable. Not until the Third Circuit's decision in *In Re I. J. Knight Realty Corp.*, 501 F.2d 62 (3d Cir. 1974), was it clear that a non-operating trustee was liable for income tax. In view of this uncertainty, and, inter alia, the fact that if allowed as administration expenses, the fire damage claims would have exhausted the estate, counsel advised the Trustee that the accounting expense required for preparation of returns could not be justified. If the Trustee incurred tax accounting expense unnecessarily he could have been exposed to surcharge.

Accordingly, since the Trustee has shown reasonable cause for late filing of the returns for 1964 and 1965, the penalty provided by Section 6651(a)(1) cannot be assessed.

V. Conclusion.

In summary, the Court holds:

(1) Assessments for fiscal years 1964, 1965 and 1966 were not barred by the statute of limitations.

(2) The Trustee was not entitled to a deduction for fire loss claims pursuant to I.R.C. Section 461(f) for fiscal 1964.

Accordingly, the tax claims of the United States are:

| 1964 | $154,803.30 |
|------|-------------|
| 1965 | 4,709.22 |
| 1966 | 5,829.71 |

(3) The tax claim of the United States for fiscal 1964 is an administrative expense of the Chapter XI receivership period.

(4) The Trustee is not liable for late filing penalties under I.R.C. Section 6651(a)(1).