ARNOLD BURKE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; NEW RESOURCES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burke v. Commissioner
Docket Nos. 2312-85; 2313-85
United States Tax Court
T.C. Memo 1987-434; 1987 Tax Ct. Memo LEXIS 431; 54 T.C.M. (CCH) 350; T.C.M. (RIA) 87434; August 27, 1987. Towner Leeper, for the petitioners. Byron Calderon, for the respondent. SHIELDS
MEMORANDUM OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioners' 1979 Federal income taxes as follows: Addition to Tax
Petitioner
Deficiency
Section 6651(a)(1)[1]
Section 6653(a)(1)
Arnold Burke
$119,396
--
$  5,979
New Resources,
19,000
$ 20,439
10,073
Inc.
*432 The issues are: (1) Whether Arnold Burke ("Burke") received unreported income in the amount of $ 243,092; (2) Whether Burke is liable for the addition to tax under section 6653(a)(1); (3) Whether New Resources, Inc. ("New Resources") received unreported income in the amount of $ 25,000; (4) Whether New Resources is entitled to a deduction for research and development expenses in the amount of $ 155,000; (5) Whether New Resources is entitled to a deduction for house and furniture depreciation in excess of the amount allowed by respondent; (6) Whether New Resources is entitled to an investment tax credit in excess of the amount allowed by respondent; (7) Whether New Resources is entitled to deductions for carry back losses from 1980, 1981 and 1982 in excess of the amounts allowed by respondent; (8) Whether New Resources is liable for the addition to tax under section 6651(a)(1); and (9) Whether New Resource3s is liable for the addition *433 to tax under section 6653(a)(1). This case was submitted fully stipulated under Rule 122. The stipulation of facts and exhibits associated therewith are incorporated herein by reference. Burke resided in Texas at the time his petition was filed. New Resources, a Texas corporation, had its principal place of business in Troy, Texas at the time its petition was filed. In February 1978, Burke, Larry Everett ("Everett") and Pat Everett incorporated Redel, Inc. ("Redel") under the laws of the State of Texas. Redel was organized for the stated purpose of conducting research and development with respect to (1) fossil and non-fossil fuel energy devices; (2) fossil and non-fossil fuels; and (3) electrical energy sources and devices. The original shareholders of Redel were Burke, Everett, and Keith Belville. In March 1978, Mid-America Dairymen, Inc. ("Mid-America"), a cooperative marketing association, became interested in developing a supplemental or emergency electrical energy source suitable for use in a dairy plant or on a dairy farm. Consequently, Mid-America, Burke, and Redel entered into an agreement under which Burke and Redel were to conduct research and development *434 with respect to such an energy source, and pursuant to the agreement, Mid-America purchased 12,000 shares of Redel stock for $ 150,000. At about the same time, Burke and certain other associates began to solicit licenses for a line of water pumps and an electrical power generating system of which the pumps were a component part. The power system which was allegedly developed by Burke was referred to as Jeremiah 33:3 [2] and was promoted as a perpetual motion machine which was purportedly able to generate electricity at no cost by continuously circulating water between two tanks. The licensees had the right to distribute the pumps and the system and to authorize others to sell them as sublicensees. The marketing efforts of Burke and his associates were directed primarily at farmers and ranchers who had a particular need for large amounts of water and electrical power. On March 7, 1979, Burke entered into a license agreement with Benjamin Smoker which gave Smoker the exclusive right to manufacture and *435 sell Jeremiah 33:3. The agreement provided that Smoker was to pay Burke $ 25,000 upon execution of the agreement and $ 200,000 within 30 days. On March 14, 1979, Burke entered into a territorial license agreement with Robert Snedigar under which Snedigar had the right to distribute Jeremiah 33:3 within certain specified states. The license was to have been one of a group of five similar licenses. In the agreement, Burke acknowledged the receipt of $ 10,000 from Snedigar on March 14, 1979. On April 16, 1979, Burke and Steve Prentice organized New Resources for the stated purpose of researching, developing, and distributing pumps and generators. Burke was the president and the sole shareholder of New Resources at all relevant times. Immediately after its organization New Resources began purchasing Redel stock, and as of December 1979 had acquired60 percent of the outstanding stock in Redel. New Resources also bought a house in August 1979 which Burke used as his personal residence for the remainder of the year 1979 and during 1980, 1981 and 1982. By May 1979, Mid-America had become concerned about the marketing activities of Burke and Redel with respect to the power system. *436 As a result, Mid-America offered to sell its stock in Redel to Burke if Burke and Prentice would execute affidavits stating that Mid-America was no longer associated in any way with the promotions or enterprises being conducted by Redel. After further negotiations Mid-America entered into in June 1979 a full and final release with Burke and Redel which completely terminated their relationship under the agreement of March 1978 and all interest of Mid-America in Redel, including stock, was to be transferred to Burke or his nominee. Under this agreement Burke was to pay Mid-America $ 150,000. On July 30, 1979, New Resources issued to Burke a check for $ 150,000 bearing the notation "Redel Stock." Burke deposited Redel's check in his personal account and on the same day gave Mid-America his personal check for $ 150,000 for such stock and had the stock issued in his own name. In August 1979, Prentice, doing business as Craig Business Services, Inc. ("Craig Services"), entered into a territorial license agreement similar to the earlier agreement between Burke and Snedigar. Pursuant to this agreement, Craig Services paid Burke $ 50,000, half of which was deposited by him in New *437 Resource's bank account. At some date prior to November 1979, the attorney general for the State of Texas launched a consumer fraud investigation with regard to the marketing of the power system. On November 2, 1979, the attorney general filed a petition in the District Court of Bell County (#81,354-C) in which Burke, Redel, New Resources, Prentice, and Craig Services were named defendants. In the petition it was alleged: Defendants are engaged in the marketing and and sale of the right to distribute a line of water pumps and an electrical power generating system (of which the pumps are a component part) claimed to have been invented and developed by Defendant BURKE. As set forth in greater detail below, the Defendants have [falsely] characterized these products as, together, capable of generating an abundant supply of electricity without the use of any outside source of power -- in effect, free energy. The power system purportedly generates electricity, at no cost, by continuously circulating water between two water tanks (upper and lower) with the water crossing an electrical generating turbine located between the two tanks. Thus, if operational, the system would constitute *438 a "perpetual motion machine." The petition also requested the state court to enjoin the defendants from any further misleading acts and to impose a constructive trust on any funds received by the defendants from licensees or other investors. A few days after the above petition was filed, an attorney representing Everett wrote a letter to Burke's attorney in which the pending lawsuit against Burke and Redel was mentioned. Everett's attorney also proposed that Burke purchase Everett's stock in Redel for $ 5,000 and a hold-harmless agreement. On December 21, 1979, the state court appointed a temporary receiver to take possession of all of the assets of Redel, New Resources, and Craig Services and of any assets of Burke which had been acquired by him with investors' funds. The state court also issued a temporary injunction on the same date which enjoined the defendants from any further promotion or marketing activity with respect to Jeremiah 33:3 and from removing from the jurisdiction of the court any moneys theretofore received by them from its promotion or sale. The temporary receiver was discharged on June 30, 1980 and the assets in his possession which had been seized from *439 the defendants were returned to their respective attorneys. However, the lawsuit in the state court continued and the injunction remained in effect against the defendants. Over the next two years several creditors and investors filed claims in the proceeding against the assets subject to the injunction. These claims included the following: CLAIMANT
YEAR FILED
AMOUNT
O. O. Brown
$ 50,000.00
Joe McDonald
1982
44,000.00
Gilbert Barnes
1982
2,672.86
Leslie Stillson
1980
25,000.00
Mark Kutscherousky
1980
5,000.00
Dennis Kutscherousky
1980
5,000.00
Paul Sir
1980
6,250.00
Vernon Bohr
1980
6,250.00
Omar Kropf
1980
25,000.00
TOTAL
$ 169,172.86
Of the above amounts, $ 72,500 was claimed against Prentice and Craig Services and $ 96,672.86 was claimed against Burke and/or New Resources. The $ 96,672.86 claimed against Burke and New Resources included the $ 50,000 claim of O. O. Brown which was the amount of a loan made by Brown to Burke and New Resources in 1980. All the other claims were for amounts invested in Jeremiah 33:3. On May 2, 1983, Burke, New Resources, and the State of Texas entered into a settlement agreement *440 regarding the state court proceeding. As part of the settlement, the temporary injunction against Burke and New Resources was made permanent and Burke agreed to plead nolo contendere to a single count of violating section 32.42(b)(12)(B) of the Texas Penal Code Ann. (Vernon 1974); to pay a fine of $ 2,000.00 for such violation; to pay civil penalties and costs of $ 2,000.00 to the State of Texas; and to convey certain property to the State of Texas, which property was to be sold and the proceeds applied to the above claims. On the same day that the settlement agreement was entered into, Burke, as president of New Resources, conveyed three tracts of real property titled to New Resources to a trustee for the Texas attorney general's office. In June or July 1986, the trustee sold these tracts of land for $ 225,772 and pursuant to a court order used a portion of the proceeds to pay property taxes, closing costs, a realtor's commission, and a federal tax lien. The balance of the sale proceeds, $ 117,795.46, was placed by the trustee in an escrow account. In September 1986, the trustee, pursuant to a court order, paid from the escrow account his fees, the fees of his attorney and *441 accountant, and certain secretarial expenses. He then disbursed the balance of $ 108,075.45 as follows: Pro Rata Share
Name of
Amount Of
Of Available
Amount
Claimant
Claim
Funds
Paid
O. O. Brown
$ 50,000.00
29.55%
$ 31,936.30
Joe McDonald
44,000.00
26.01%
28,110.42
Gilbert Barnes
2,672.86
1.58%
1,707.59
Paul Sir
6,250.00
3.69%
3,987.99
Vernon Bohr
6,250.00
3.69%
3,987.99
Omar Kropf
25,000.00
14.78%
15,973.55
Leo Stillson
25,000.00
14.78%
15,973.55
Mark Kutscherousky
5,000.00
2.96%
3,199.03
Dennis Kutscherousky
5,000.00 2.96%
3,199.03
Totals
$ 169,172.86  100%
$ 108,075.45
Burke filed a timely return for 1979 using the cash method of accounting. However, New Resources' return for 1979 was prepared on the accrual basis of accounting and was untimely filed on June 14, 1982. When the receiver was appointed for New Resources in December 1979 he retained a CPA to handle its return. The CPA advised the receiver that no income tax return was due at that time from New Resources and that he would obtain any necessary extensions when the return was due. Later, the CPA incorrectly advised *442 the receiver that the return for 1979 was under an extension.
Burke's Unreported Income
In the notice of deficiency issued to Burke, respondent determined that Burke received the following unreported income with respect to Jeremiah 33:3: Source
Amount
Date
Smoker Manufacturing
$ 50,000
March 1979
License
Snedigar License
10,000
March 1979
Craig Services
25,000
September 1979
Services, Inc.
Respondent also determined that Burke received unreported dividend income from New Resources as a result of the following events: Event
Amount
Purchase of Redel Stock from Mid-America
$ 150,000
Purchase of Redel Stock from Everett
5,000
Fair Rental Value of Residence
3,092
On brief Burke does not address any of the above determinations except the determination that the Mid-America transaction resulted in a dividend to Burke. It is concluded therefore that the other determinations are conceded by Burke. With respect to the Mid-America transaction Burke contends that he was merely a conduit for a payment to Mid-America by New Resources of an ordinary and necessary business expense. Both petitioners first *443 claim the transaction represented the payment of an ordinary and necessary business expense of New Resources because New Resources feared that without the payment Mid-America would pursue legal remedies against Redel and cause harm to New Resources' business. They also claim the transaction constituted the payment of such an expense by New Resources because it was payment by Resources for research and development services performed by Burke. For the following reasons we cannot agree with petitioners. First, the record before us contains no concrete evidence [3] that Burke was to use the funds provided by New Resources to buy Mid-America's stock in Redel for New Resources' account. Instead we have found that New Resources merely issued a check for $ 150,000 to Burke, which he deposited in his own account and then bought the Redel stock with his own check and had it issued in his name. His reliance on our decision in Old Town Corp. v. Commissioner,37 T.C. 845 (1962), is misplaced because that case is clearly distinguishable on this point on its facts. *444 Second, even if we ignored the mechanics of the transaction, i.e., that Burke bought and owned the stock in his own name, we are unable to find in the record before us any logical reason why New Resources would have paid $ 150,000 to Mid-Atlantic in order to protect its business. See Old Town Corp. v. Commissioner,37 T.C. at 859. The record is also devoid of evidence that any research and development services were rendered by Burke for New Resources. We conclude therefore, that all of respondent's determinations with respect to Burke's unreported income are correct.
Burke's Liability for Addition to Tax under Section 6653(a)(1)
The addition to tax found in section 6653(a)(1) is properly imposed when an underpayment of tax is due to a taxpayer's negligence or intentional disregard of rules or regulations. Since we have found that Burke omitted several specific items of income totalling over $ 242,000 it is apparent that such omissions constituted at least negligence and, therefore, respondent's determination is sustained.
New Resources' Unreported Income
*445 Respondent determined that the $ 25,000 which Burke received from Craig Services in September 1979 and deposited into New Resources' bank account constituted taxable income to New Resources. Since Burke was the president and sole stockholder of New Resources respondent's determination must be sustained especially in the absence of any evidence which tends to refute the determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
New Resources' Deduction for Research and Development
Respondent disallowed that portion of New Resources' claimed deductions for (1) the $ 150,000 which New Resources paid Burke and was used by him to purchase the Redel stock from Mid-America; and (2) the $ 5,000 which New Resources paid Burke and was used by him to purchase the Redel stock from Everett. Since we have previously found that these payments constituted dividends to Burke no deduction is allowable to New Resources for such expenditures and respondent's determination with respect to them is correct.
New Resources' Depreciation and Investment Tax Credit
Respondent disallowed 50 percent of the depreciation deduction and the investment tax credit *446 claimed by New Resources on the residence and its furnishings which were used by Burke in 1979 as his personal residence. New Resources did not address these disallowances on brief, and thus they are sustained. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).
New Resources' NOL Carrybacks
New Resources filed timely claims for deductions in 1979 for net operating losses incurred in 1980, 1981, and 1982. Respondent disallowed that part of each carryback from 1980, 1981, and 1982, which is attributable to 50 percent of the depreciation claimed for those years on the personal residence of Burke. As stated in the preceding section, New Resources has not addressed on brief the disallowance of the depreciation deductions consequently, the issue is deemed to be conceded. In 1980 and 1982, New Resources accrued and deducted as part of its operating losses for those years the claims filed against New Resources by the investors in Jeremiah 33:3. Respondent disallowed in 1979 that part of the 1980 and 1982 net operating loss carrybacks which is attributable to these claims because, according to respondent, the claims did not become allowable deductions until *447 1983, at the earliest, when New Resources transferred property to the State of Texas in satisfaction of the claims. New Resources contends that under section 461(f) the claims are deductible in 1980 and 1982. As a general rule a taxpayer using the accrual method of accounting cannot deduct a contested liability until settlement of the dispute. See section 1.461-1(a)(2), (3)(ii), Income Tax Regs.; United States v. Consolidated Edison Co. of New York,366 U.S. 380 (1961). However, section 461(f) contains a special rule which permits the accrual of a contested liability in the year in which the liability is provided for by the taxpayer rather than the year in which the contest is settled. Section 461(f) reads in pertinent part as follows: If -- (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the *448 time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. * * * New Resources contends that it met each of the four criteria found in section 461(f) in the following manner: (1) it contested the Jeremiah 33:3 claims filed by the investors in 1980 and 1982; (2) the appointment by the state court of the receiver in December 1979 constituted a transfer of all of New Resources' assets to the receiver to provide for satisfaction of the claims; (3) the contest with respect to such claims existed after the transfer; and (4) the investors' claims had accrued by the time the receiver was appointed. We are unable to agree because (1) to satisfy the second criterion of section 461(f) the transferred property must be placed beyond the taxpayer's control until the contest is settled; (2) with respect to the fourth criterion, New Resources was not entitled to accrue in 1979, the year of the alleged transfer, any liability for the claims not asserted until 1980 and 1982; and (3) under the *449 fourth criterion of section 461(f) any claim otherwise accruable would be allowable in 1979, the year in which the transfer occurred according to petitioner. However, in our view of the situation confronted here no transfer within the meaning of section 461(f) occurred in 1979 or at any time prior to the settlement in 1983 since the appointment of the receiver was temporary, the temporary receivership was terminated on June 30, 1980 and the assets of New Resources were returned to its attorney. Furthermore at the time the temporary receiver was appointed no claims had been asserted. We conclude therefore, that New Resources was not entitled to accrue any of the claims until settlement was entered into in 1983. See Matter of I. J. Knight Realty Corp.,431 F. Supp. 946 (E.D. Pa. 1977).
New Resources' Liability for Section 6651(a)(1) Addition to Tax
The addition to tax under section 6651(a)(1) is properly imposed whenever a taxpayer fails to file a timely return unless such failure is due to reasonable cause and not to willful neglect. New Resources claims that *450 it failed to file a timely return because its receiver relied on a CPA to do so and such reliance constitutes reasonable cause. However, in United States v. Boyle,469 U.S. 241, 252 (1985), the Supreme Court held that "the failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing under section 6651(a)(1)." Since Boyle is squarely in point and involved facts very similar to those under consideration here, we sustain respondent's determination that New Resources is liable for the addition to tax under section 6651(a)(1).
New Resources' Liability for Addition to Tax Under Section 6653(a)(1)
Respondent determined that New Resources is liable for the addition to tax provided by section 6653(a)(1) for negligence or intentional disregard of rules or regulations. Since New Resources has offered no explanation for failing to report the $ 25,000 received from Craig Services or for claiming depreciation deductions and an investment tax credit on the residence used personally by Burke, its president and only shareholder, we conclude that respondent's determination *451 is correct. Decision will be entered for respondent.
Footnotes
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
2. A reference to Jeremiah 33:3 (King James) which reads as follows: Call unto me, and I will answer thee, and shew thee great and mighty things, which thou knowest not. ↩
3. The notation "Redel Stock" on New Resources' check is not sufficient evidence to establish that the stock was being acquired for New Resources since Burke was the president and sole stockholder of New Resources. ↩